496 P.2d 864

**Larry D. SPECTOR, Appellant,**

v.

**Lois E. SPECTOR, Appellee.**

**No. 2 CA–CIV 999.**

Court of Appeals of Arizona, Division 2.

May 4, 1972.

Rehearing Denied June 7, 1972.

Review Denied July 13, 1972.

D'Antonio & Videen, by Lawrence P. D'Antonio, Tucson, for appellant.

Whitehill, Berger, Gin & Karp, P. C., by Edward B. Berger and David D. West, Tucson, for appellee.

HATHAWAY, Judge.

This appeal is from a divorce decree. dismissing defendant's counterclaim, directing payment of alimony and child support, dividing community property and. ordering the defendant-husband, appellant herein, to pay community debts and attorneys fees.

The parties were married in Mt. Vernon, New York, on December 28, 1958. Three children, aged 10, 8 and 5 at the time of

trial in November 1970, were born of that union. The parties moved to Arizona from New York in 1963. The defendant has continuously resided in Arizona, the plaintiff and children having moved to New Jersey during the pendency of this action. Numerous allegations of error have been propounded by appellant. For ease of consideration we have grouped the allegations under applicable headings.

## DIVISION OF COMMUNITY PROPERTY

Defendant claims the trial court found community assets valued at $122,162.04. Of this amount $61,700.00 was awarded plaintiff and $60,464.04 awarded defendant. Defendant was, however, ordered to pay community obligations which he claims amounted to $123,204.32, thus, there were not sufficient assets to pay the obligations.[1]

1. We do not agree with defendant's computation of the assets, liabilities and awards as submitted in his brief for reasons appearing in the body of our opinion. Our computations disclose the following:

### COMMUNITY ASSETS

| | Defendant's Comput. | Court's Comput. |
|---|---|---|
| Note receivable, "Eller Advertising" | $46,000.00 | $46,000.00 |
| Stock in Santa Rosa Nursing Home | 28,000.00 | 28,000.00 |
| Stock in Wilshire Investment Club | 300.00 | 300.00 |
| Residence | 38,000.00 | 38,000.00 |
| Cash value of life insurance | 3,631.00 | 3,631.00 |
| Checking account at bank | 4,831.04 | 4,831.04 |
| Mercury Station Wagon | 1,400.00 | –0– |
| Furniture | –0– | 8,000.00 |
| | $122,162.04 | $128,762.04 |

### COMMUNITY LIABILITIES

| | Defendant's Comput. | Court's Comput. |
|---|---|---|
| Notes payable, Martin Spector | $82,000.00 | $82,000.00 |
| Residence mortgage | 18,000.00 | 18,000.00 |
| Note payable, Polack | –0– | 5,000.00 |
| Current bills | 3,999.75 | 3,999.75 |
| Plaintiff's obligations | 1,905.32 | –0– |
| Due Santa Rosa Nursing Home (overpayment of wages) | 21,300.00 | –0– |
| | $123,204.32 | $108,999.75 |
| Net assets | ($1,043.28) | $19,762.29 |

| AWARDS | DEFENDANT | PLAINTIFF |
|---|---|---|
| Note receivable, "Eller Advertising" | $ –0– | $46,000.00 |
| Stock in Santa Rosa Nursing Home | * 14,000.00 | 14,000.00 |
| * (cash award in lieu of stock to plaintiff) | | |
| Stock in Wilshire Investment Club | –0– | 300.00 |
| Residence | 38,000.00 | –0– |
| Cash value life insurance | 3,631.00 | –0– |
| Checking account | 4,831.04 | –0– |
| Mercury Station Wagon | | * (1,400.00) |
| * (Court found this to be separate property) | | |
| Defendant's computation | $60,462.04 | $61,700.00 |
| Furniture | 5,000.00 | 3,000.00 |
| Court's computation | $65,462.04 | $63,300.00 |

He asserts only "net" assets may be distributed. Defendant recognizes that the record must be reviewed by this court in a light most favorable to upholding the decision of the trial court and that the trial court has wide discretion in dividing and distributing community property in a divorce case. He urges, however, that the trial court abused that discretion and that the record is devoid of probative evidence in behalf of plaintiff to support the judgment, findings of fact and conclusions of law.

 Standards for property distribution pursuant to a divorce judgment are set forth in A.R.S. § 25–318, subsec. A (Supp. 1971–72) which provides:

> "On entering a judgment of divorce the court shall order such division of the property of the parties as to the court seems just and right, according to the rights of each of the parties and their children, without compelling either party to divest himself or herself of title to separate property. . . ."

The statute does not mandate a distribution of only net assets but rather vests the widest discretion in the trial court to distribute the property as it deems "just and right." Defendant in support of his argument cites the following language from McClennen v. McClennen, 11 Ariz.App. 395, 398, 464 P.2d 982, 985 (1970):

> "But, not only should the court take into consideration the value of the community property, it should also take into consideration the total amount of the community liabilities in deciding the division of the property."

We agree that normally the trial judge must consider the community liabilities as such requirement is implicit in making a just distribution. Once having considered the liabilities, however, the trial court can with-in its discretion properly allocate payment of the liabilities to one or both parties. Srock v. Srock, 11 Ariz.App. 483, 466 P.2d 34 (1970). The question before us is whether the trial judge abused his discretion in the instant case.

 Plaintiff introduced testimony and exhibits illustrating that $82,000 of the community liabilities was in the nature of a "family obligation," which in all likelihood would not be repaid. Indeed, the trial court found notes payable to Martin Spector, father of defendant, in the amount of $82,000,[2] "some of which was treated as community property;" that although some sums due on the notes were longstanding, defendant's father had never made a demand for payment; that the court was unable to determine the exact nature of the obligation [apparently due to inadequate records], and most crucial, that on four separate occasions involving two different banks defendant did not list the notes as being a liability on his financial statement when applying for loans from those banks. The defendant himself referred to the obligation as a "father-son relationship," which "luckily" he didn't have to pay tomorrow.

The court further found that shortly after plaintiff filed for a divorce defendant sold community securities purchased for $54,465.64 and received cash in the amount of $33,023.54[3] which he disposed of by paying "some obligations, child support and alimony payments resulting in the fact that all of the funds received for the sale of securities were expended prior to the trial of this action." There was no showing that defendant was compelled to divest himself of separate property to satisfy the obligations and the order under the circumstances was not an abuse of the trial court's discretion.

---

2. The record reveals the figure $83,150 was also used at times. We have used the figure $82,000 as found in the judgment and this entire amount is reflected in the $108,999.75 community liability set forth in footnote 1.

3. The trial transcript reveals that actually the $33,023.54 was merely the first check defendant received for the sale of the securities. Subsequent receipts increased the amount to approximately $39,000.00.

Appellant further argues that only in cases where there has been clear evidence of a flagrant violation of traditional marital duties may the court make an unequal division of property, Finck v. Finck, 9 Ariz. App. 382, 452 P.2d 709 (1969), and that the instant case even lacks corroboration of the grounds for divorce as required by A.R.S. § 25–317, subsec. B (1956). The trial court found defendant guilty of "excesses and cruel treatment toward plaintiff" and that plaintiff was not guilty of like conduct toward defendant.

■ The purpose of corroboration is to prevent collusion and when, as here, the divorce was vigorously contested and there was plainly no collusion only slight corroboration will suffice. Williams v. Williams, 86 Ariz. 201, 344 P.2d 161 (1959). Unlike *Williams* where the plaintiff failed to call a single witness plaintiff here called Dr. Leland Reeck, a psychiatrist. Dr. Reeck testified that he first saw plaintiff for underlying problems in her relationship with her parents. In his words, "the marriage problems came in as present stresses which he felt could be handled by therapy directed at the earlier problems." He further testified that some months later plaintiff returned being disturbed about her marital relationship; that she seemed intent upon delving into the problems in her marriage in an attempt to solve them and work them out, and that she was trying to change herself to accomplish these results. He testified that defendant "was not accepting his change, was not searching for what he could change within himself to make the marriage work;" that he had requested defendant to come in for interviews which he did twice and then stopped, and that in his opinion defendant "did not want to participate in this or would not participate." He also testified that in his view there was an objective basis for plaintiff's finding this marriage difficult and ending up where it did.

Defendant himself testified that due to the tremendous pressures he was under at the time as a result of his job and business ventures that: "I was just not a very

understanding person," and that on one occasion he had slapped plaintiff after a heated argument. Defendant in his counterclaim alleged cruelty on the part of plaintiff and offered corroborating testimony of his brother, Alan, to show that the marital difficulties were the result of plaintiff's immature attitude toward money and her need to spend beyond their means. Alan's testimony, while suggesting the problems stemmed from plaintiff's overspending, also substantiated that the marriage had been in "turmoil . . . since the fall of '69," and that the couple had constantly argued and bickered.

■■ We believe the evidence supported the trial court's granting of the divorce to the plaintiff and the rejection of defendant's counterclaim. There is no requirement that corroboration be the equivalent of confirmation.

"It is necessary only that the testimony of the complaining party be supported and strengthened by the corroborating evidence, not that it be confirmed in detail, (citation omitted). Corroborating testimony is sufficient if it tends to satisfy the impartial and reasonable mind that the plaintiff's material testimony is true, (citations omitted)." Kennedy v. Kennedy, 93 Ariz. 252, 254, 379 P.2d 966, 968 (1963).

Defendant further argues that Dr. Reeck's testimony must be excluded because "he was merely parroting the plaintiff, not in any way substantiating the truth of her testimony." Dr. Reeck, however, was not testifying to the truth of statements made to him by plaintiff but rather offered his opinion regarding the nature and causes of the problems for which he was treating plaintiff. A physician may base his opinion entirely on his personal examination and observation of the plaintiff, or in part on the history as related to him by the patient. M. Udall, Arizona Law of Evidence § 24 (1960). Plaintiff was a patient of Dr. Reeck from March 1967 to June 1970. In addition, he saw defendant on at least two occasions. Defendant did not object to his

testimony at trial and we find when it is taken with defendant's and Alan Spector's testimony, it sufficiently corroborated plaintiff's material allegations.

 Other circumstances besides violation of the traditional marital duties may be considered by the trial court in distributing the property. Finck v. Finck, supra. In the instant case not only did the court find plaintiff to be faultless it found that: She had been accustomed, since marriage, to living on $3,000 a month; her only employment had been light duties in the nursing home managed by her husband where she earned over $14,000 a year; she had medical problems with her back requiring hospitalization in the past which may continue,[4] and that as a result of the decree her earning power would be limited in the future. Further, as we have pointed out there is some evidence that defendant dissipated community assets after the divorce was filed and that he physically abused plaintiff. Plaintiff claimed that defendant's only attempt to salvage the marriage was to "[lay] a path, financially, so that he could divest himself of his interests, and [he] was just playing a waiting game so that he would finanacially [sic] be in a better position when he finally left the house." Even from reading the cold record we are inclined to agree that defendant attempted to exercise his business acumen to plaintiff's detriment throughout the later stages of the marriage and during the proceedings below. We believe these are circumstances properly to be considered by the trial court in making the award. Neither is this a case, as in Finck v. Finck, supra, (limited by the court to the "peculiar circumstances"), where the award will leave the husband without assets and jobless after years of diligent work in the community's behalf.

In short, basic justice and fairness does not mandate a different award in this case. In Arizona it is not necessary that the award be even only that it be just.[5] Nace v. Nace, 104 Ariz. 20, 448 P.2d 76 (1968). Under the circumstances we find no error in the distribution.

 Defendant next contends that the trial court's finding that a 1967 Mercury automobile was the separate property of plaintiff is unsupported by the evidence. Testimony indicated that plaintiff's mother sent to her $3,500 and that this and other monies were used by defendant to purchase a $5,400 station wagon which was registered in defendant's name. The evidence may have supported a finding that this automobile was community property. However, it was within the discretion of the trial court to properly distribute the assets and we find no abuse of that discretion in making the award to plaintiff.

 The trial court found that any sums [6] claimed to be due and owing to Santa Rosa Building Corporation (nursing home) by the parties had been paid or that there was no bona fide claim which such corporation intended to pursue for overpayment of wages to the parties. Defendant claims this finding is gratuitous, unsupported by the evidence and not a relevant matter upon which the trial court could make a finding. While we agree that the finding of the trial court is not a bar should the Santa Rosa Nursing Home sue the parties and recover a judgment, we do not agree that the finding was outside the province of the trial court in the case *sub judice.* As defendant himself has pointed out, before an equitable distribution can take place pursuant to A.R.S. § 25–318 (Supp.1971–72) the trial court must consider both community assets and com-

4. Defendant, without citing authority, claims the trial court erred in making the finding regarding plaintiff's back condition because her testimony was not corroborated. We know of no such requirement in a divorce proceeding. Further, her testimony was uncontested at trial. Defendant's point is without merit.

5. Other states, California for example, require equal distribution pursuant to statutory mandate. See Cal.Civ.Code § 4800 (West 1970) [formerly Cal.Civ.Code § 146 (West 1954)].

6. See footnote 7, infra.

munity obligations. It necessarily follows that before a division can take place there must be a determination as to the nature of contested items. The finding of fact is merely the written evidence of this determination and the only requirement on review is that it be supported in the record by adequate evidence. Testimony and exhibits reflect that defendant's father had the controlling interest in the nursing home and that defendant was the co-owner and manager and signed the checks including his salary check; that defendant's father had seen to it that the parties had sufficient funds on which to live, and that he had never made a request that the amounts be repaid. In short, this obligation is much like the "family obligation" owed to defendant's father heretofore discussed. We find no abuse of discretion in the trial court's finding that no valid debt existed in favor of the nursing home for purposes of the property distribution.

## ALIMONY AND CHILD SUPPORT

▇▇ Plaintiff was awarded $200 per month alimony and $250 per month for each of the three children in child support totaling $11,400 a year. Defendant contends the awards were contrary to the evidence and not consonant with his ability to pay. In setting alimony and child support payments the trial court must consider the needs of the wife and her ability to pay, other considerations including the standard of living of the party receiving the payment and the ability of the obligated party to pay. McClennen v. McClennen, supra. We have mentioned that plaintiff and the children had been accustomed to an above normal standard of living and that plaintiff's earning power was found by the trial court to have been limited because of the divorce. The only question here is the ability of the defendant to pay.

▇▇ Defendant claims his gross salary now is only $16,500 leaving a net after-tax balance of $13,200 which is not a suf-

ficient amount upon which he can live and pay an $11,400 yearly requirement. The trial court found that defendant's salary had been $35,750 a year but that $19,250 had been "disallowed" by Santa Rosa Nursing Home because of a Medicare limitation [7] thus, the $16,500. The court found further, however, that the disallowance was "sham . . . for the purposes of affecting the decision of this court. . . ." This finding was apparently based on the fact that the nursing home was co-owned by defendant's father and himself, controlled by defendant's father and managed by defendant, and that the disallowance occurred on the eve of plaintiff's filing for divorce. The court's finding is substantiated by the fact that the parties' adjusted gross income for the years 1967–69 was respectively $36,771.66, $42,268.28 and $61,710.78. Defendant points out that these amounts were implemented by the largesse of both parents and that the trial court found that the financial position of defendant's father could not be considered in making the awards. Defendant relies on Henning v. Henning, 89 Ariz. 330, 362 P.2d 124 (1961) in contending that the ability of the parents to grant bonuses cannot be considered by the court in setting alimony and child support. We agree that the financial position of the parents is not a proper matter for consideration. However, we believe that defendant has misinterpreted *Henning* which holds that possible future earnings of the obligated party is a proper consideration in determining alimony and child support. *Henning* was a case of disputed willingness on the part of the defendant's father to continue to make bonus payments to the defendant. Regarding the disputed evidence the Arizona Supreme Court held that when the trial judge is sitting without a jury he is presumed to consider only competent evidence. Citing *Henning* in his treatise, Professor Clark states:

> "Alimony need not be limited by the husband's income as of the time of trial. If he is not earning as much as he might,

7. The amount allegedly owed Santa Rosa Nursing Home of $21,300 arises from this

disallowance of salary and disallowance of part of plaintiff's salary.

either deliberately or through poor management, alimony may be calculated on the basis of what the court thinks he could and should earn. Likewise his future prospects for increased earnings may be considered in arriving at alimony." H. Clark, The Law of Domestic Relations § 14.5 at 443 (1968).

Defendant testified that he would not continue to receive a salary in excess of $16,500. However, on cross examination he admitted that he could receive a larger salary if it was not for a by-law passed by the directors (defendant, his father Martin Spector and a third party) of Santa Rosa Nursing Home limiting his salary to the amount reimbursed by Medicare. We have examined the by-law and attendant minutes of the March 1969 directors' and shareholders' meeting. The by-law did provide for reimbursement by officers of the corporation of amounts paid in salary over what was reimbursed by Medicare. However, it left the duty of enforcement solely to the discretion of the directors. The minutes further provided that "[a]ny such adjustments prior to the next Directors' meeting would be at the discretion of the President [defendant]." At the 1970 meeting defendant alluded to the Medicare problems with the federal government and his marital difficulties. The directors reduced his salary to $1,500 a month (still above the Medicare allowance) ostensibly because of Medicare cutbacks. At the same time Martin Spector was appointed Executive Director of Santa Rosa and salaried at $1,600 per month to "endeavor to negotiate a satisfactory solution with the Federal Government." Defendant's salary reduction was to remain "until profitable operation was once again established." The 1970 meeting took place on March 17th the day before plaintiff filed for divorce. We note that in the years immediately preceding the divorce action Santa Rosa was enjoying a profit, even with the higher salaries. Further, defendant had demonstrated an ability to earn more in the years immediately preceding the divorce. The record also reveals that defendant has other income of $100 a

month from a mortgage and $300 a month in interest or some $4,800 per year. In addition, defendant's automobile and an expense account are provided by the nursing home. We believe there was evidence which would support the trial court's finding that defendant's salary reduction was a sham and we find the award of alimony and child support was adequately supported by the record.

The trial court in its divorce decree allowed the defendant visitation rights. It further ordered:

"[T]he Defendant shall continue to pay child support as ordered by this Judgment even during periods of visitation by the children with the Defendant."

Defendant asserts the above order is an abuse of the trial court's discretion relying on Badertscher v. Badertscher, 10 Ariz. App. 501, 505, 460 P.2d 37, 41 (1969), where the court stated:

"The appellant actually supported the children during this period and to require that he also furnish the full support payments to appellee is unwarranted."

Defendant, however, fails to distinguish between periods of custody ordered by the court, as in *Badertscher,* and temporary visitations pursuant to the original judgment. This distinction was recognized in Cole v. Cole, 101 Ariz. 382, 420 P.2d 167 (1966) where the Arizona Supreme Court stated:

"It would therefore be inequitable to force him to pay twice for the support of the child. *If defendant had custody of the child for only a short period of time, such as a vacation, the rule would of course be different, because in that instance plaintiff would have an overhead expense and her total expenses would be only slightly reduced."* 101 Ariz. at 384, 420 P.2d at 169. (Emphasis added.)

Defendant's assertion is without merit. Further, contrary to defendant's assertion, we find no abuse of discretion in the trial court's finding that defendant had sufficient means to pay the transportation costs for the children from New Jersey to Ari-

zona when they were visiting him. See Badertscher v. Badertscher, supra.

The trial court ordered defendant to pay plaintiff $1,000 a month for child support and alimony *pendente lite*. During the period from this order and the trial of the action plaintiff incurred obligations in Arizona in the amount of $1,905.32. In the divorce decree the court directed that defendant pay this sum. Defendant, without citing authority, claims that absent an application by plaintiff and a showing of necessity, need or other factors that the trial court could not properly order him to pay the $1,905.32. Plaintiff replies that the amount was a community debt pursuant to A.R.S. § 25–215 (1956). Neither party offered evidence to show the community or separate nature of this debt and the court made no such finding. Assuming in support of the judgment, that this expenditure was made for "necessities" of plaintiff and the children, defendant would not be liable to third party creditors. Joseph v. Schoenwald, 148 Wash. 649, 269 P. 797 (1928); Dauterive v. Sternfels, 164 So. 349 (La. App.1935). The rule is stated in 41 C.J.S. Husband and Wife § 51(c) (1944):

> "Where provision for the wife's support by the husband has been ordered by a court, he remains liable for necessaries furnished before the order or decree, or before compliance therewith; but, where he is making payments in obedience thereto, he is relieved from subsequent liability for necessaries."

See also, Wolf v. Friedman, 20 Ohio St.2d 49, 253 N.E.2d 761 (1969); R. H. Macy, Inc. v. Herskowitz, 56 Misc.2d 847, 290 N. Y.S.2d 390 (1968); Annot., 60 A.L.R.2d 7, § 36 (1958). The same reasoning applies in the instant case. Plaintiff was awarded temporary alimony after a hearing pursuant to A.R.S. § 25–315 (1956). If the amount awarded was not sufficient plaintiff could have, by proper motion and evidence, invoked the trial court's discretion to grant an increase. She did not request such increase nor present evidence at trial as to the necessity of the expenditure of

the $1,905.32. The judgment is hereby modified to relieve defendant from paying said sum and if he has paid it plaintiff is ordered to remunerate him for his payment.

## ATTORNEY'S FEES

Defendant's final allegation of error is that the court abused its discretion in fixing attorney's fees in the amount of $6,500. We find no such abuse. The award of attorney's fees is within the sound discretion of the trial court. Kennedy v. Kennedy, 93 Ariz. 252, 379 P.2d 966 (1963). Considerations in fixing the fee include the extent to which the action is contested, the size of the marital estate and the difficulties in determining the value of the property and its character as separate or community. Warner v. Warner, 34 Cal. 2d 838, 215 P.2d 20 (1950). Defendant relies on the testimony of plaintiff's expert in response to a hypothetical question that if the net estate, under the circumstances of this case, was in the area of $5,000, then $3,500 to $4,000 would be a reasonable fee. As we previously indicated, the exact amount of the net estate in the instant case was unascertainable by the trial court. In any event, it was substantially over $5,000. In addition, plaintiff introduced evidence that her attorney had spent 204 hours in preparation, 3 days in trial and 9 hours in court appearances. Much of the time spent was in an effort to discover hidden assets of defendant both in Tucson, Arizona, and New York, resulting in the location of some assets according to the testimony of plaintiff's attorney. Under these circumstances we find no abuse of discretion.

The judgment is affirmed as modified.

HAIRE, J., and LLOYD C. HELM, Judge of the Superior Court, concur.

NOTE: Judges HERBERT F. KRUCKER and LAWRENCE HOWARD having requested that they be relieved from consideration of this matter, Judges LEVI RAY HAIRE and LLOYD C. HELM were called to sit in their stead and participate in the determination of this decision.