NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In re the Marriage of:

GILLIAN JANET BIGLER MAYFIELD, *Petitioner/Appellant*,

*v.*

JAMES JEFFERSON MAYFIELD, IV, *Respondent/Appellee*.

No. 1 CA-CV 24-0523 FC

FILED 02-13-2025

Appeal from the Superior Court in Maricopa County
No. FN2022-051682
The Honorable Colleen E. O'Donnell-Smith, Judge

**AFFIRMED IN PART; VACATED AND MODIFIED IN PART**

COUNSEL

Tiffany & Bosco, P.A., Phoenix
By Kelly Mendoza
*Counsel for Petitioner/Appellant*

Singer Pistiner, P.C., Scottsdale
By Robert S. Singer
*Counsel for Respondent/Appellee*

---

**MEMORANDUM DECISION**

---

Presiding Judge Cynthia J. Bailey delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Andrew M. Jacobs joined.

---

**B A I L E Y**, Judge:

**¶1** Gillian Janet Bigler Mayfield ("Wife") appeals from several rulings in the decree dissolving her marriage to James Jefferson Mayfield IV ("Husband"). For the reasons stated below, we affirm all the rulings except for one, *infra* Section VI, which we vacate and modify.

**FACTS AND PROCEDURAL HISTORY**

**¶2** This is the parties' third marriage to each other. They married in 2006, 2012, and this marriage took place in June 2015. Wife petitioned for dissolution in September 2022.

**¶3** After a one-day trial, the superior court issued a decree allocating community and separate real property, personal property, and debts. The court also awarded attorneys' fees to Husband. We discuss the relevant facts as we address each ruling on appeal. We have jurisdiction over Wife's timely appeal under A.R.S. § 12-2101(A)(1).

**DISCUSSION**

I.     Duress

**¶4** Before the marriage, Husband inherited several hundred acres in Alabama that had been in his family for generations. The parties agree this was Husband's separate property at the time of the marriage. Husband also owned a pre-marital real estate development business called Black Warrior. Black Warrior held title to Husband's Alabama property. Sometime during the marriage, Black Warrior became Black Warrior Living, LLC ("BWL"), with Husband as the sole owner.

**¶5** On September 10, 2019, Husband deeded 160 acres of the Alabama property to Wife, which she held in her name. On April 23, 2020, Husband amended the BWL operating agreement to give Wife a 49% ownership interest. According to Husband, he transferred these assets to

Wife after years of emotional and physical abuse that centered on her demands for an interest in the Alabama property. Therefore, he argued, the transfers resulted from duress and were invalid. Wife argued the transfers were legitimate exchanges. According to Wife, Husband conveyed the land as payment for work her late husband did for Husband before 2005. And she claimed Husband gave her an ownership interest in BWL because she contributed significant labor and funds to BWL and saved it from financial ruin. Husband denied these allegations.

**¶6**      The superior court rejected Wife's version of events and found that Husband acted under duress for each of these transactions. Specifically, the court found "that Husband was under threat of serious harm . . . throughout their marriage if he did not bend to her will and do as she demanded to the point where he was unable to exercise free will and judgment . . . ." Thus, the court found the deed conveying 160 acres of Alabama property to Wife and the amended BWL operating agreement were unenforceable and awarded the Alabama property and BWL to Husband as his separate property.

**¶7**      Wife argues the superior court erred in finding Husband acted under duress. She contends that Husband's duress defense was untimely and that he had reasonable alternatives available that defeat his duress claim. We review de novo the validity and enforceability of the deed and the BWL operating agreement. *See Buckholtz v. Buckholtz*, 246 Ariz. 126, 129, ¶ 10 (App. 2019). We consider the evidence in the light most favorable to upholding the decree, giving deference to the superior court's assessment of witness credibility. *Lehn v. Al-Thanayyan*, 246 Ariz. 277, 284, ¶ 20 (App. 2019).

**¶8**      Duress occurs when one party induces another to enter a contract by means of a wrongful threat that overrides the other's exercise of free will and judgment. *Dunbar v. Dunbar*, 102 Ariz. 352, 355–56 (1967); *Inter-Tel, Inc. v. Bank of Am., Ariz.*, 195 Ariz. 111, 117, ¶¶ 35–36 (App. 1999); *see also* Restatement (First) of Contracts ("First Restatement") § 492(b) (1932) (assent induced by wrongful threat that causes "such fear as precludes [another] from exercising free will and judgment"); Restatement (Second) of Contracts ("Second Restatement") § 175(1) (1981) (assent induced by "improper threat . . . that leaves the victim no reasonable alternative"). A contract procured under duress is unenforceable. *USLife Title Co. of Ariz. v. Gutkin,* 152 Ariz. 349, 356 (App. 1986).

A.      Husband's Duress Claim Was Timely

¶9          Wife argues that Husband's duress claim was untimely because he first raised it in the pretrial statement nearly four years after he signed the amended operating agreement giving her a 49% interest in BWL and more than four years after he deeded 160 acres to her. She cites *Hubbard v. Geare*, 77 Ariz. 262 (1954), which holds that a party seeking to void a contract executed under duress must act promptly. *Id.* at 264–65.

¶10         In *Hubbard*, the court found the defendant ratified the lease allegedly signed under duress because he remained in possession of the property for eighteen months after the threat was removed. *Id.* at 265. By contrast, here Wife's threats and physical abuse did not abate after Husband signed the deed to the 160 acres or after he amended the BWL operating agreement. Wife also fails to cite to any evidence that Husband manifested an intention to affirm the deed or operating agreement which would constitute ratification. Wife equates silence with ratification. But this ignores the ongoing nature of the abuse.

¶11         Wife asserts that after she obtained an order of protection in September 2022, the threat of physical and emotional harm ceased. She implies that therefore, Husband should have claimed duress at that time. To be sure, Husband's response to the dissolution petition did not assert a duress claim. But neither Wife's petition nor his response listed specific assets as community or separate property, so the failure to assert duress at that time does not necessarily waive the defense. Although duress was not included among the several issues Husband listed when he asked for additional trial time, this pleading does not limit the issues to be tried. Husband properly raised duress in the joint pretrial statement.

B.      The Record Supports the Duress Finding

¶12         Wife next argues that Husband did not show duress because he had reasonable alternatives to signing the deed and amending the BWL operating agreement. Duress requires the absence of a reasonable alternative. *See Inter-Tel*, 195 Ariz. at 118–19, ¶ 42 (finding no reasonable alternative where plaintiff could not find another lender due to defendant's conduct); *Sharp v. Sharp*, 179 Ariz. 205, 209 (App. 1994) (rejecting claim that wife signed agreement under duress because she could have called her attorney a second time or mailed a letter when the attorney did not take her collect call), *superseded by rule on other grounds as recognized in Hutki v. Hutki*, 244 Ariz. 39, 43, ¶ 18 (App. 2018). The First and Second Restatements express the same principle—one lacks free will when he or she has no

reasonable alternative. *Compare* First Restatement § 492(b) (defining duress as fear that "precludes [the] exercise of free will and judgment"), *with* Second Restatement § 175(1) (duress is assent induced by "improper threat . . . that leaves the victim no reasonable alternative").

**¶13**　　　Wife contends Husband's duress claim is based on his loneliness. Not so. The superior court credited Husband's testimony and evidence of years of physical and emotional abuse at Wife's hand. The decree detailed Wife's ongoing abuse to pressure Husband to give her his Alabama property such that he did not act of his own free will when he deeded 160 acres to Wife or when he effectively gave her 49% of the remaining property by giving her a 49% interest in BWL. The record supports these findings.

**¶14**　　　Wife also argues that Husband alleged duress only as to transactions in which he gave up property, not those that worked to his advantage. This argument, like Wife's argument about the difference in their physical stature, goes to the weight of evidence supporting duress, and we do not reweigh evidence on appeal. *See Lehn*, 246 Ariz. at 284, ¶ 20.

**¶15**　　　Wife next argues that even if her threats were improper, Husband had several opportunities to escape her control and seek independent advice. Specifically, she notes that Husband met with his physician and his attorney, and he had two sessions with his psychiatrist without her. She also argues she did not control Husband because he often left the home during their arguments, stayed at hotels, and they had divorced two times before. Wife contends Husband could have divorced her or obtained an order of protection rather than succumb to her alleged threats. The superior court did not expressly state that Husband had no reasonable alternative, but by finding duress, we presume the court made this finding. *See Rinegar v. Rinegar*, 231 Ariz. 85, 90, ¶ 20 (App. 2012) (presuming superior court found every fact necessary to support its ruling where parties did not request written findings of fact or conclusions of law).

**¶16**　　　Husband contends Wife waived this argument because she did not assert at trial that he had reasonable alternatives. Even though Wife did not specifically assert that he had "reasonable alternatives" at trial, the parties testified to the facts she relies on in arguing this theory. For this reason, there was no waiver.

**¶17**　　　There is no duress "if the victim has a reasonable alternative to succumbing and fails to take advantage of it." Second Restatement § 175, cmt. b; *see also* First Restatement § 492, cmt. c ("A state of such fear may

continue long after the threats that cause it, but in determining the probability of this, time, distance, opportunity to obtain disinterested advice and protection, are all important."). Wife fails to state how visits with his physician and psychiatrist offered Husband a reasonable alternative as neither could prevent her abuse. Husband's attorney proposed giving Wife a conditional ownership interest in BWL, but for reasons not apparent in the record, Husband instead gave Wife a 49% ownership interest. Although this shows Husband consulted his attorney, Husband also testified that the abuse continued after that date and supports the reasonable inference that the abuse would continue until Wife had an actual ownership interest in BWL.

¶18 Generally, asserting one's rights in court is a reasonable alternative to acquiescence. *See Republic Nat'l Life Ins. Co. v. Rudine*, 137 Ariz. 62, 66–67 (App. 1983). "This alternative may not, however, be reasonable if the threat involves, for instance, . . . the use of oppressive tactics, or the possibility of emotional consequences." Second Restatement § 175, cmt. b. "The standard is a practical one under which account must be taken of the exigencies in which the victim finds himself . . . ." *Id.*

¶19 Here, record evidence supports that Wife's years of abuse constitute oppressive tactics with emotional consequences to Husband. Husband documented and testified to Wife's continued emotional and physical abuse intended to exert pressure on him to give her the Alabama property that had been in his family for generations. The superior court found Husband feared Wife throughout the marriage, which implies that his fears did not abate in the nights he spent at hotels. Husband testified that he had to transfer the property to Wife or else endure more abuse.

¶20 We affirm the conclusion that Husband had no reasonable alternative when he signed these contracts. *See, e.g., Baer v. Baer*, 904 S.E.2d 815, 821 (N.C. App. Ct. 2024) (holding that ongoing abuse and threats created a question of fact about whether spouse signed a settlement agreement under duress); *Coburn v. Rhodig*, 1 CA-CV 18-0194 FC, 2019 WL 1530298, at *4, ¶ 16–17 (Ariz. App. Apr. 9, 2019) (mem. decision) (finding that enforcing spousal support obligation in court was not a reasonable alternative where the obligor-spouse threated to leave the state or commit suicide unless obligee-spouse agreed to a lesser amount).

> Domestic violence is often characterized by a pattern of "coercive control" that affects the battered partner's perception of the choices available and the consequences of those choices. *See, e.g.*, Jeffrey R. Baker, *Enjoining Coercion:*

6

*Squaring Civil Protection Orders with the Reality of Domestic Abuse*, 11 J.L. & FAM. STUD. 35, 47–48 (2008) ("A batterer's coercion does not force a victim's compliance by physical assault but does deprive a victim of liberty and volition by distorting her choices or perceived choices, and the price to pay for disobedience."). Courts must be sensitive to this dynamic when evaluating the validity of a prenuptial agreement if allegations of domestic violence are made.

*Andrew B. v. Abbie B.*, 494 P. 3d 522, 538, n.47 (Alaska 2021).

¶21        The record supports the finding that Wife's continual abuse caused Husband to give her his separate Alabama property and that Husband did not have a reasonable alternative to her demands for the property. We affirm the ruling that the 160 acres and BWL are Husband's separate property.

II.     Community Equitable Lien on Husband's Alabama Property and BWL

¶22        Wife argues the superior court erred by failing to award the community an equitable lien for its contributions to Husband's separate Alabama property and BWL.[1]  Husband argues Wife waived this issue by not raising it at trial.

¶23        Wife did not ask the superior court to award the community an equitable lien on Husband's separate Alabama property or BWL. Presumably this is because Wife claimed she was entitled to nearly half of that property under the 2019 deed and amended operating agreement. At trial, Wife asked the court to award all the Alabama property and BWL to Husband and all other community property to her. Thus, she waived the equitable lien argument by not raising it at trial. *See Bobrow v. Bobrow*, 241 Ariz. 592, 597, ¶ 23 (App. 2017).

III.    Community's Equitable Lien on Wife's Bramble Berry Property

¶24        Before the marriage, Wife owned a home on Bramble Berry Lane in Arizona ("Bramble Berry"). Wife rented the property to tenants except when the parties lived there. The parties disputed how long they

---

[1] We combine our analysis of Wife's arguments that the court failed to award an equitable lien for the community's contributions to BWL and the 160 acres of Alabama property. For purposes of the equitable lien issue, these arguments are indistinguishable.

lived in the Bramble Berry home during the marriage. According to Husband, they lived there three years. Wife testified that they only lived there for eighteen months, and she rented it all other times.

¶25 Wife testified that she deposited the rental income into US Bank account #4116, the same account she used to pay the mortgage and expenses. She asserts that she kept these funds separate, so the community is only entitled to an equitable lien for the eighteen months the parties lived there and paid the mortgage themselves. Husband argued that Wife did not keep the rental income separate and that she failed to adequately trace the commingled rental income. Therefore, he argues that community funds paid the Bramble Berry mortgage throughout the marriage, and he calculated the equitable lien accordingly.

¶26 The superior court found Wife failed to show that the rental income in US Bank account #4116 was traceable. The court also accepted Husband's testimony that the parties lived at Bramble Berry and paid the mortgage for three years. Thus, the court concluded that community funds paid for all Bramble Berry mortgage payments during the marriage (84 months) and calculated the equitable lien based on that period. Wife argues this was error.

¶27 "The commingling of separate and community funds into one account does not transmute the entire account into a community account so long as the funds remain traceable." *Noble v. Noble*, 26 Ariz. App. 89, 95–96 (1976). The Bramble Berry monthly mortgage payments of around $1,475 came from Wife's US Bank account #4116 between January 2019 and September 2022. Deposits into account #4116 consisted of Husband's separate funds and community funds in addition to the Bramble Berry rental income. Thus, the commingled funds were transmuted to community property absent a tracing.

¶28 A review of the deposits into US Bank account #4116 shows a combination of rental income and transfers from Wife's other bank accounts and from some unknown sources. For example, over several months the only deposits into account #4116 came from Wife's individual US Bank account #3521. Wife's US Bank account #3521 included funds from BWL and gas royalties (Husband's separate property), rent from Bramble Berry tenants (Wife's separate property), and money Wife earned renovating and selling homes (community earnings). Thus, Wife commingled her separate funds, Husband's separate funds, and community funds in account #3521. She then transferred those comingled funds from account #3521 into account #4116 and paid the Bramble Berry mortgage from account #4116.

**¶29**     Wife failed to show that deposits from rental income were enough to pay for the mortgage and expenses on her separate Bramble Berry property. Absent more detailed evidence from Wife about the amount of rental income and the source of the other deposits into account #4116, her tracing was deficient. Thus, the commingled funds in US Bank account #4116 are community property. Because these funds paid the mortgage on Wife's separate property, the community was entitled to an equitable lien. *See Saba v. Khoury*, 253 Ariz. 587, 590, ¶ 8 (2022).

**¶30**     The parties disputed the number of months that the court should use to calculate the equitable lien. We defer to the superior court's resolution of this disputed fact. *See Hurd v. Hurd,* 223 Ariz. 48, 52, ¶ 16 (App. 2009) (appellate court defers to the superior court's weighing of conflicting evidence and judging of witness credibility). Based on Husband's testimony, the court properly awarded the community an equitable lien for the entire length of marriage.

IV.     Range Rover

    A.     Characterization of Vehicle as Community Property

**¶31**     The parties bought a Range Rover in November 2021. According to Wife, it was her birthday gift from Husband. At the time of the purchase, Husband wrote a note stating, "As a birthday Gift, I relinquish my community property rights in the new 2020 Range Rover serial #[XXXX] that we are buying from Benz and Beamer on 11-26-2021 . . . For my wife Gillian Bigler . . . Happy Birthday Darling Love Jeff!" Husband claimed Wife forced him to buy the Range Rover and he signed the note under duress while Wife stood over him.

**¶32**     The superior court credited Husband's testimony that he was under duress when he relinquished his community interest in the Range Rover "out of fear of abuse by Wife." As a result, the court found the Range Rover was community property, ordered it sold, and ordered Wife to pay the remaining car loan balance.

**¶33**     Wife again argues that Husband failed to claim duress until the pretrial statement some eighteen months after the transaction and that he had reasonable alternatives. For the reasons stated above, *see* discussion *supra* Section I.B, we reject these arguments.

**¶34**     Wife cites testimony from the salesperson as evidence that the Range Rover was a gift. Although the note and the salesperson's testimony suggest that the parties bought the Range Rover for Wife's birthday present,

Husband's testimony to the contrary supports the finding that any intent to give Wife the Range Rover resulted from the ongoing abuse and coercion. The superior court considered this conflicting evidence and accepted Husband's testimony. Viewing the evidence in the light most favorable to upholding the decree and giving deference to the superior court's assessment of witness credibility, *Lehn*, 246 Ariz. at 284, ¶ 20, we affirm the finding that the Range Rover is community property.

### B. Allocation of the Range Rover Debt

¶35 At trial, Wife asked to be reimbursed for the car payments she made post-petition totaling $19,836. She also argued that Husband should pay the remaining $34,094 car loan or reimburse her for all future payments because the car was a gift. Despite finding the Range Rover was community property, the superior court denied Wife's request for reimbursement, ordered it sold, and found the loan was Wife's separate obligation.

¶36 On appeal, Wife argues Husband should be solely responsible for all loan payments (past and future) because he bought the car as a gift for her. Because we affirmed the finding that there was no gift, Wife's argument fails.

## V. Equalization of the Bank Accounts

¶37 Wife argues the superior court erred in finding the following accounts were community property: TD Ameritrade account, Arizona Bank & Trust accounts, and seven US Bank accounts (#8553, #4082, #7287, #4132, #3784, #3521, and #4174). According to Wife, the separate funds she deposited into these accounts were traceable and therefore, did not transmute the accounts to community property. *See Cooper v. Cooper*, 130 Ariz. 257, 259 (1981) ("[W]here community and separate property are commingled, the entire fund is presumed to be community property unless the separate property can be explicitly traced.") (citation omitted); *see also In re Marriage of Cupp*, 152 Ariz. 161, 164 (App. 1986).

¶38 Wife relies on Husband's tracing evidence. Husband showed that these accounts held a combination of Husband's separate funds, Wife's separate funds, and community funds. But Husband's evidence did not identify which funds in Wife's accounts are Wife's separate property. Instead, he showed that Wife regularly transferred his separate funds among all of the multiple accounts, thereby commingling them with other unidentified funds. For example, Husband wrote a $58,000 check to Wife from his separate property BWL bank account after he sold one parcel of land, and Wife deposited $58,000 on same date into her US Bank account

#4082. This evidence did not sufficiently trace the source of the funds in Wife's separate accounts, so they were transmuted to community property. *See Cupp*, 152 Ariz. at 164.

**¶39** As to the TD Ameritrade account specifically, Wife testified that she opened that account during the marriage, and it included her earning from selling houses and profits from BWL. Thus, the funds in the TD Ameritrade account are a combination of community property (Wife's earnings), and Husband's separate property (BWL profits). *See* A.R.S. § 25-211(A) (property acquired during the marriage is community property unless acquired by gift, devise, or descent); *Koelsch v. Koelsch*, 148 Ariz. 176, 181 (1986) (earnings received during marriage are community property). Wife failed to trace her separate funds, if any, in the TD Ameritrade account.

**¶40** Wife had the burden to show how much of the separate funds in her accounts remained traceable by clear and convincing evidence. *See Cooper*, 130 Ariz. at 259–60. Husband's evidence did not suffice, and referring generally to exhibits containing hundreds of pages of bank statements is not clear and convincing evidence. We affirm the finding that the bank accounts listed above are all community property.

VI.     Characterizing Jewelry as Community Property

**¶41** The decree addressed three pieces of jewelry: a ruby bracelet, diamond hoop earrings, and a yellow diamond ring. The court found the bracelet and earrings were community property, and because Wife owned the ring before marriage, it was her separate property. Wife argues that the superior court erred in finding the bracelet and earrings were community property given her uncontroverted testimony that Husband gave her these two pieces as gifts before the 2015 marriage.

**¶42** Whether property is community or separate is a question of law reviewed de novo, but whether a gift has been made is a question of fact. *In re Marriage of McCulloch*, 257 Ariz. 168, 172, ¶ 9 (App. 2024). We affirm the court's factual determinations absent clear error. *Id.*

**¶43** Although the superior court had the discretion to decline to credit Wife's testimony, Husband's evidence supports Wife's testimony. Husband argued, generally, that the parties acquired $45,000 in jewelry during the marriage. He offered an exhibit showing the pieces of jewelry he claimed were purchased during the marriage. The photos did not include a bracelet or earrings. The trial and deposition testimony mostly related to other pieces of jewelry not at issue on appeal. Given Husband's

evidence, we cannot say the evidence supports finding the bracelet and earrings are community property. We therefore vacate that ruling and modify the decree to award these pieces to Wife as her separate property.

VII.    Post-Petition Credit Card Interest

**¶44**        After Wife filed for dissolution, the parties sold the Amber Sun home, a community property investment property. The parties agreed to split the sale proceeds and hold the funds in their attorneys' trust accounts. During the litigation, the parties disagreed about paying down significant community credit card debt with the proceeds.

**¶45**        At trial, Husband argued that Wife alone should pay the nearly $13,000 in credit card interest that accrued post-petition based on her refusal to pay down the credit card debt with Amber Sun sale proceeds. The superior court found the $74,619 in credit card debt was a community obligation and assigned half the debt to each party. The court assigned the credit card interest to Wife, plus any additional interest that accrued since trial "based on her refusal to agree to pay off the credit card balances with the Amber Sun proceeds . . . ." Wife argues the court unfairly penalized her because Husband had rejected her counter-offer on this issue.

**¶46**        The superior court has broad discretion to equitably allocate community debts. *See Cadwell v. Cadwell*, 126 Ariz. 460, 462 (App. 1980). We will affirm this discretionary ruling absent an abuse of discretion, *McCulloch*, 257 Ariz. at 173, ¶ 15, and defer to the weight the superior court gave the disputed evidence. *See Hurd*, 223 Ariz. at 52, ¶ 16.

**¶47**        In response to Husband's request to use the proceeds to pay the community credit card debt, Wife counter-proposed that Husband's attorney "retain $100,000 and hold it in trust subject to reallocation" and divide the remaining net sale proceeds equally. The email then stated, "The $100,000 more than covers the debts that [Husband] alleges are community debts that need to be paid. [Wife] would agree that those funds shall not be distributed absent a final order or other order on how to use the funds within the Trust." A reasonable reading of this email is that Wife agreed to *hold* $100,000 in the trust account—not pay off the debt—pending a court order and divide the remaining sale proceeds to the parties. If, as Wife now claims on appeal, she was proposing to pay off the credit card debt with the $100,000, there would be no dispute.

**¶48**        Our reading is consistent with Wife's later email questioning how much of the debt was for community purposes—an issue Wife wanted to review before agreeing to use the Amber Sun proceeds to pay the credit

card debt. Husband presented evidence that Wife then delayed reviewing the credit card statements until just before trial, causing more interest to accrue. Husband's continued position that the Amber Sun proceeds should be used to pay down the debt was reasonable under the circumstances. This evidence supports the court's discretionary ruling that it was equitable to order Wife to pay all the interest that accrued on the community credit cards post-petition. *See Toth v. Toth*, 190 Ariz. 218, 221 (1997) (holding that A.R.S. § 25-318 requires an equitable, not necessarily equal, allocation of community property).[2]

VIII.   Award of Attorneys' Fees to Husband

**¶49**         The superior court may award attorneys' fees to a party "after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings . . . ." A.R.S. § 25-324(A). The superior court reviewed these factors and found Wife acted unreasonably, thereby increasing the costs of litigation. The court awarded Husband attorneys' fees of $21,000, citing Arizona Rule of Family Law Procedure ("Rule") 92. We review an award of attorneys' fees for an abuse of discretion. *In re Marriage of Williams*, 219 Ariz. 546, 548, ¶ 8 (App. 2008). The court abuses its discretion if it commits an error of law in making a discretionary decision. *Id.*

A.      Wife's Unreasonable Positions

**¶50**         Courts apply an objective standard when assessing the reasonableness of a party's position. *Id.* at 549, ¶ 12. Wife argues she was objectively reasonable and did not cause Husband to incur significant additional fees. Although the court did not cite specific instances of Wife's unreasonable positions, it was not obligated to do so because neither party requested written findings of fact or conclusions of law under Rule 82. Thus, we presume the court found every fact necessary to support its ruling. *See Rinegar*, 231 Ariz. at 90, ¶ 20.

**¶51**         The superior court found Wife made several claims that were not supported by any evidence. Wife also removed funds from and closed several bank accounts just before she petitioned for dissolution. This caused Husband to spend significant time at trial and in discovery detailing

---

[2] We do not consider Wife's argument that the calculation of the amount of interest was mathematically incorrect because she raised that argument for the first time in the reply brief. *See Johnson v. Provoyeur*, 245 Ariz. 239, 243 n.5, ¶ 13 (App. 2018) (issues first raised in a reply brief are waived).

Wife's various financial transfers. These positions support the decision to award Husband a portion of his attorneys' fees.[3]

**¶52** We defer to the superior court's weighing of Husband's alleged unreasonableness or other issues on which Wife claims she was reasonable. *See Hurd*, 223 Ariz. at 52, ¶ 16. The record supports the award of fees to Husband based on a finding that Wife acted unreasonably.

### B. The Superior Court's Citation to Rule 92

**¶53** Wife argues the superior court committed legal error because it cited to Rule 92 when it awarded fees to Husband. Rule 92 applies to contempt proceedings. But Husband did not allege and the court did not find Wife in contempt. The reference to Rule 92 is misplaced, but the court properly focused on the relevant A.R.S. § 25-324 factors when addressing attorneys' fees. The parties also addressed the reasonableness factors at trial and on appeal. Thus, Wife has not shown how she was prejudiced by the erroneous reference to Rule 92. The error is harmless and does not warrant relief.

## IX. Attorneys' Fees on Appeal

**¶54** Both parties request an award of attorneys' fees and costs on appeal under A.R.S. § 25-324. After considering the parties' financial resources and reasonableness of their positions, we order each party to pay their own attorneys' fees. However, Husband is entitled to an award of costs under A.R.S. § 12-342 upon compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

**¶55** We affirm the decree except for the ruling relating to jewelry, *see supra* Section VI, which we vacate and modify.



---

[3] Contrary to Wife's assertion, the superior court did not apply a prevailing party standard.